## SUPREME COURT.

In the matter of ISAAC ADRIANCE agt. THE SUPERVISORS OF
THE CITY AND COUNTY OF NEW-YORK.

Where a *specific* duty is imposed by statute on *public officers or bodies*, they
may be compelled, where it affects a particular party only, to exercise it by
*mandamus*, although an *action for damages* may also lie.

The supervisors of a county are not to be controlled as to the amount to be al-
lowed by them for services chargeable on the county, when they are to judge
of the value of the services; but if there be a sum chargeable against the
county, and they reject it *as illegal*, and it *is legal*, they will be compelled
by *mandamus* to admit the claim, and to decide how much is payable un-
der it

In the city of New-York, the board of supervisors, in some respects, has greater
powers than those in the country.

The power of correcting an erroneous assessment, or of remitting or reducing a
tax imposed by law, it is well known, is exercised by the *new board*, after the
term of the officers composing the board which imposed the tax has expired.
This power, too, is given by law to the board of supervisors, as a *quasi* cor-
poration—as a body known to the law as always in existence, however the
members of it may change.   Although the assessment-rolls may have passed
out of the hands of the supervisors of the city and county of New-York, they
have the power, on a proper application, to correct them, whether the supervi-
sors in other counties have that power or not.

The *tax-commissioners* of the city and county of New-York have no power to
*increase* the assessors' *valuation* of property; their power, under the act of

Adriance agt. The Supervisors of the City and County of New-York.

1851, authorizes them to add and assess, according to law, any real or personal estate liable to taxation, which may have been *omitted by the assessors*, or (in the language of the act) "*which may not have been assessed*" by the assessors. It was not intended that this should be an appellate power to *increase* the assessor's valuation; it is limited by its terms to cases in which the estate has not been assessed by the assessors, or in which, by accident or otherwise, they have not exercised their judgment. Therefore *held,* that where the tax-commissioners *increased* the assessed valuation of the estate, as made by the assessors, the board of supervisors could be compelled, by *mandamus,* to correct the assessment by conforming it to the original assessment, as made by the assessors.

The *affidavit* alone of the owner, to reduce the valuation of his property below that imposed by the assessors, without the *examination, or without the examination being reduced to writing*, either before the assessors or before the tax-commissioners, as required by law, is of no avail as evidence, to reduce the tax.

*New-York Special Term, Dec.,* 1854.

MOTION for mandamus.

Isaac Adriance moves for a mandamus against the supervisors of the county of New-York, to require them to remit so much of the taxes on his real estate in John-street, as is levied on the increased valuation of said property by the tax-commissioners, beyond the valuation by the assessors; and also to remit the tax on any valuation of his property on the Third and Fourth avenues, and between 58th and 59th streets, beyond the value sworn to by him.

The John-street property belonged to Mrs. Adriance, and was valued by the assessors for 1853 at $22,000 : the tax-commissioners raised the valuation to $28,000, and when applied to to restore it to the former valuation, refused to do so. Mr. Adriance applied to this court to compel the tax-commissioners to restore the valuation, and it was refused on the ground that the control of the books had passed from the commissioners. He then applied to the supervisors to correct the valuation, and they refused.

The block on the avenues was valued by the assessors at $31,000 ; Adriance appeared before the commissioners, and made affidavit that it was, in fact, worth no more than $20,000. That affidavit was retained by the commissioners, but they re-

fused to adopt it as a correct valuation. Other lands belonging to him were valued by the assessors at certain sums, and the valuation increased by the tax-commissioners. Mr. Adriance applied to the supervisors to correct all these alleged errors, or irregularities, and they refused.

JEREMIAH E. CARY, *for plaintiff.*
ROBERT J. DILLON, *for defendants.*

MITCHELL, Justice. The first question in these cases is, whether a mandamus is the proper remedy?

In *The People ex rel. Philip Church* agt. *The Supervisors of Allegany*, (15 *Wend.* 198,) a *certiorari* was refused, because the writ was in the discretion of the court, and the objections made to the assessments, if valid, " were not such as affected the relator's interest alone, but were, in principle, applicable alike to every person who was named in the tax list :" that the complaint was not that "the relator had been required to pay more than his just proportion of the county burdens; but that in consequence of the allowance of illegal charges, his tax, *in common with that of every other person* named in the assessment-rolls, had been improperly increased." (15 *Wend.* 204.)

Here the relator applies on grounds peculiar to himself; and his application is not for a *certiorari*, which, by bringing up all the proceedings, might stay the collection of all taxes, but for a *mandamus*, which would, if he is correct, make an assessment legal in amount and form, which is now illegal in both respects.

In *Hull* agt. *Supervisors of Oneida County*, (19 *J. R.* 259,) a surgeon, who had rendered services to a pauper, applied for a mandamus to the supervisors to compel them to audit and allow his account. The mandamus was refused on the merits, on the ground that the services were gratuitous; but the court held that it was the proper remedy, but for that objection; and that " when the inferior tribunal has a *discretion*, and proceeds to exercise it, this court has no jurisdiction to control that discretion by mandamus;" but if the subordinate public agents refuse to act, or to entertain the question for their discretion in

Adriance agt. The Supervisors of the City and County of New-York.

cases where the law enjoins on them to do the act required, it is the office of the court to enforce obedience to the law by mandamus, in cases where no other legal remedy exists. (*p.* 262.) And they held that " if the *claim was legal*, there was no doubt of their jurisdiction to instruct and guide the supervisors in the execution of their duty by *mandamus*—not to control their discretion in judging what is a reasonable compensation for such services, *but to compel them to admit the claim as a county charge*, and to *exercise their discretion as to the amount.*" (*p.* 263. *See, also, the same distinction in The People ex rel. Phœnix agt. Supervisors of New-York*, 1 *Hill*, 362–7.)

Chief Justice SPENCER had said before, in *The People ex rel. Wilson* agt. *Supervisors of Albany*, (12 *J. R.* 415,) that " the office of a writ of mandamus is to require the persons to whom it is directed to do some particular thing, *which appertains to their office and duty*, and which the court issuing it supposes to be consonant to right and justice; and that if the party making the application has a legal right, and no other specific legal remedy, the writ generally goes." The latter part of this opinion is to be understood in connection with the power, as applying only to matters appertaining to a public office or duty.

In *Bright* agt. *The Supervisors of Chenango County*, (18 *J. R.* 242,) the court granted the writ to compel the supervisors to audit and allow the account of the clerk of the county, for books purchased by him for recording deeds, mortgages, &c., in his office—the court holding that they were proper county charges, but not passing on the value of the books.

*The Bank of Utica* agt. *The City of Utica*, (4 *Paige*, 399,) was a bill to compel the city to remit a tax laid on the surplus funds of the bank, beyond its fixed capital. The relief was granted, as the objection that the remedy was at law, was waived; and the Chancellor said, that " as the charter of the city of Utica gives to the common council of that city the exclusive control and direction as to the assessment and collection of the city taxes, he thought the complainant had a perfect remedy at law, by an application to the supreme court for a mandamus, to *compel the common council to correct their assessment and taxa-*

*tion of the property* of the bank, if it was illegal; but that the remedy would be much more imperfect and doubtful in the case of an ordinary town and county tax, where the assessment is made by one body and the tax imposed by another, especially if the error, or illegality, did not appear upon the face of the assessment-roll.

In *The People* agt. *The Mayor of New-York,* (10 *Wend.* 393–397,) the court, on the merits, refused the relief, but held that *mandamus* was the proper remedy to compel the corporation to execute a lease on a sale for taxes; and that it was no objection that relief might be had in equity or by indictment. In that case an action for damages would equally have lain.

NELSON, Chief Justice, says, that whenever a *legal* right exists the party is entitled to a *legal* remedy, and, when all others fail, the aid of this may be invoked. But that case, and the others before referred to, show, although they do not so declare, that where a *specific* duty is imposed by statute on *public officers or bodies,* they may be compelled to execute it by mandamus, although an action for damages might also lie.

In *Smith, &c., pier-proprietors in the city of Albany,* agt. *The Comptroller of the State,* (18 *Wend.* 659,) a mandamus was granted to compel the comptroller to pay certain tolls collected by him for the state, and which the pier-proprietors were entitled to receive from him, unless the state could hold them as a set-off to another claim; the court holding the claim of the state to a set-off was bad.

In *Onderdonk* agt. *The Supervisors of Queens County,* (1 *Hill,* 195,) the allegation of the relator was, that the *town* auditors had improperly allowed a certain sum as a charge against the *town* of North-Hempstead; and the board of supervisors of the county then directed that sum to be levied upon the town, and the warrant for that purpose was issued to the collector.

The court held that no certiorari, mandamus, or prohibition could issue to the collector, as he was a mere ministerial officer: that the *certiorari* to the town auditors, or to the supervisors, would bring up only such proceedings as still remained before them, and could not remove the warrant in the hands of the

NEW-YORK PRACTICE REPORTS. 229

Adriance agt. The Supervisors of the City and County of New-York.

collector; and that if the supervisors had before them the certificate in due form of the auditing of the town accounts, that was a sufficient authority for the supervisors, whether the accounts had been, in fact, properly audited or not; and the court compared this to the case of *The People ex rel. Church* agt. *The Supervisors of Allegany.*

In *The People ex rel. The Bank of Watertown* agt. *The Assessors of the Village of Watertown,* (1 *Hill,* 616,) the court held that banking associations were taxable as incorporated banks on their capital. The question was raised on *mandamus,* but no point was made whether that was the proper remedy or not.

In *The People ex rel. M'Master and Harvey* agt. *Supervisors of Niagara,* (4 *Hill,* 20,) the assessors had assessed two banking associations and a railroad company, and the supervisors of the county struck out the names of all three of the companies from the assessment-roll. The court granted a peremptory mandamus to compel the supervisors to restore their names.

In *The Ontario Bank* agt. *Bunnell,* the court held that if certain capital of a bank was not taxable, the bank should have applied to the proper officers to reduce the amount, and the court said that if the relief was improperly refused, " there was an *appropriate* remedy." (10 *Wend.* 195.) This seems to imply a peculiar remedy—not the common remedy by action of trespass.

These cases decide that the supervisors of a county are not to be controlled as to the amount to be allowed by them for services chargeable on the county, when they are to judge of the value of the services; but if there be a sum chargeable against the county, and they reject it as illegal, and it is legal, they will be compelled by mandamus to admit the claim, and to decide how much is payable under it. And the general principle may be stated, that where a *specific* duty is imposed on them, or other public officers, by statute, and they do not conform to the statute, and the omission to conform affects a particular party only, and not the whole assessment-list, a mandamus will issue to compel them. If, in the cases now before the court, the supervisors had no right by statute to order the

collection of taxes according to a valuation imposed by the tax-commissioners, when the assessors had imposed a smaller valuation, or to impose the collection on the valuation of the assessors, where the party made such affidavit as was made here, then they have violated the statute, and should be made to conform to it, unless the application is too late.

When a specific duty is enjoined by statute, it is made specific because the public interest requires that it should be executed in that way. It is better for the public that the specific remedy be applied to removing the wrong directly, than to have actions for damages, in which a supervisor may be punished in heavy damages for an irregularity, although he erred only in judgment; or in which the complainant may find a judgment in his favor fruitless of any practical results, except the payment of the costs of his own counsel. The citizen who is unlawfully taxed ought not to be baffled by sending him from court to court, to seek some untried remedy, unless that remedy is clear, if that which he seek may lawfully be granted.

Is the application too late, because the supervisors have passed the books out of their hands into the hands of the collector? It was so intimated in *Onderdonk* agt. *The Supervisors of Queens.* (1 *Hill.*) But the supervisors in this city have greater powers than in the country.

In this city, the assessment-books or rolls are delivered to the receiver about the 1st of September in each year. (*Laws* 1850, *ch.* 121, § 27.) Mr. Adriance presented his petition to the supervisors about the 7th of January, 1854—about four months after the books were delivered to the receiver, and it was rejected in April following.

By the laws of 1844, (*ch.* 250, § 2,) the supervisors in this city may (at any meeting at which the mayor or recorder shall be present) correct any *erroneous* assessment which might thereafter be made by the assessors, provided *application* for the relief should be made within six months after the assessment-rolls should be returned as required by law; and provided proof were made to the satisfaction of the supervisors, by affidavit of the applicant or other legal evidence, that the *erroneous* assess-

ment did not result from any neglect on the part of the person applying for relief.

By § 28 of the law of 1850, the same board may remit or reduce a tax, as imposed by law, for good cause shown by affidavit and filed with the tax-commissioners; and such reduction or remission must be made before the collection of the tax; and the application therefor must be made within six months from the delivery of the books to the receiver for collection.

This power of correcting an erroneous assessment, or of remitting or reducing a tax imposed by law, it is well known is exercised by the new board after the term of the officers composing the board which imposed the tax has expired. This must be the intention of the law which gives six months to the citizen, after the books are delivered to the receiver, to apply for the relief; and those books are by law to be delivered on or before the 1st of September; so that, ordinarily, the six months would not expire before the 1st of March—and the terms of office of one-half of the aldermen expire at the end of each year. The power, too, is given to the board of supervisors as a quasi-corporation—as a body known to the law as always in existence, however the members of it may change; and the power is given to that legal entity, thus always existing, that it may alter and correct the assessments. Although, therefore, the books may have passed out of the hands of the supervisors, they still have the power to correct them, whether the supervisors of other counties have that power then or not.

The statute is, that the supervisors *may* correct the erroneous assessment, or remit or reduce the tax. This is not merely permissive to them, at least where the application is on the ground of an *erroneous* assessment: however it may, when the tax is sought to be reduced as a charity or favor. The term "may" means "must" in a statute, when a right is given or duty imposed. It is a strict right of an aggrieved party to have an erroneous assessment corrected, and it is the duty of one who has power to correct it, to do so.

The objection of the supervisors was not put on the ground that Mr. Adriance was too late, or had not shown that the error

in the assessment had not proceeded from any neglect on his part. No objection has been made to the right of Mr. Adriance to appear as relator on account of the property on John-street belonging to his wife. If it were raised, the writ might be allowed, as to that property, to issue in the name of both; or it might be that he, as liable for the taxes imposed on his wife's real estate, would be entitled to proceed alone.

This brings us to the questions raised by the relator. The distinctive powers of assessors, and of tax-commissioners or supervisors, may be judged from the duties imposed on each. The assessors are appointed for towns or wards only; they are to value each parcel of the real estate within their town or ward, and the personal estate of each of the inhabitants of the same place. This they can do by viewing each parcel of land of each owner within their limits, and by inquiries and other means. Their information may thus reach to each individual and to his property, and is intended to, and may easily have, this effect. From the narrow limits within which they are to act, they are presumed to be able to acquaint themselves with the value of each piece of property within their cognizance, and the fortune of each individual.

Under the Revised Statutes, they were bound, after making their assessment, to give twenty days' notice that they would meet to review their assessments, and on application of any one conceiving himself aggrieved, to review their assessment; and if such person had not previously made an affidavit of the value of his property, they were bound, on receiving such affidavit, to reduce the assessment to the sum specified in the affidavit. (1 *R. S.* 393, § 22.) This was conclusive on them, and on all others, and accordingly in their return they stated, that they had valued the property in the return at its true value, *except when the value had been sworn to by the owner.* (*Id.* 394, § 26.) If the owner had made the like affidavit before the publication, this was equally conclusive, (*p.* 393, § 17.)

Here their duties ended. The board of supervisors of the county then having received the rolls from the assessors of their several towns or wards, were to examine the rolls—for certain

purposes prescribed—so as plainly to exclude any interference with the valuation made by the assessors of the property of any particular individual, at least so as to increase it. The supervisors being county officers, could not be supposed to have the accurate knowledge of the separate properties, in any town or ward, that the assessors of such town or ward would have; but they would have a better means of judging whether the whole or aggregate valuation of any one town or ward in the county was more or less than it should be, in comparison with other towns or wards. Accordingly, the supervisors, under the Revised Statutes, were to examine the rolls of the several towns, for the specific "purpose of ascertaining whether the valuations in one town or ward bore a just relation to the valuations of all the towns and wards in the county," and to accomplish this purpose, and this only, "they might increase or diminish the *aggregate* valuations of real estate in any town or ward, by adding or deducting such sum upon the hundred as might, in their opinion, be necessary to produce a just relation between all the valuations of real estates in the county;" (*id*. 395, § 31;) but they could in no case reduce the *aggregate* valuation of *all* the towns and wards below the aggregate valuation thereof as made by the assessors.

By a law passed for this city in the same year that the Revised Statutes took effect, (1830, *ch*. 365,) all the assessors of the city were to form a board of assessors, but without power to increase any individual assessment. They were to adopt such rules as would be best calculated to produce equality and uniformity in the different valuations of property and assessments in the several wards; and after the assessment-rolls should be completed, and *before* the fair copies should be made for the inspection of the inhabitants, they were to compare the several rolls "for the purpose of ascertaining whether the valuations in one ward bore a just relation to all the wards in the city." (§ 4.) In other words, to judge between ward and ward, not between an individual and the state. They had also the same power as the Revised Statutes gave to supervisors to increase or diminish the *aggregate* valuation of real estate in any

ward, by adding or deducting such sum upon the hundred as might, in their opinion, be necessary to produce a just relation between all the valuations of real estate in the city; and the same power, with the same limitations, was also given to the supervisors. (*Id.* §§ 4 & 8.) So the law continued until 1850 or 1851, when, the defendants contend, the law was altered.

The act of 1850 (*ch.* 121) did not alter the duties of the assessors, severally nor as a county board, from what they were before. (§§ 10, 11.) It appointed tax-commissioners, and required them to keep a record of all taxable property, and of persons subject to taxation, and of all maps, and to preserve the assessment-rolls; also to prepare books with proper blanks for the assessors, and to examine and compare the assessment-rolls for the several wards, for the same purposes, and with the same powers, before stated as to supervisors. (§§ 15, 16, 17.) They then were to give three weeks' notice, that the " assessors have *completed* their assessment-rolls," and that the tax-commissioners will meet to *review the assessments on the application of any person conceiving himself aggrieved.* (§ 18.)

Thus their power to review is limited to the case when the application is made by a person conceiving himself aggrieved. Who that person is, is shown by the next section. They are required, (§ 19,) on the application of any person conceiving himself aggrieved, to review the assessment; and when the person objecting—(evidently meaning the same person before spoken of)—has not been previously examined, under oath, by any assessor concerning his property, and made affidavit according to law, they must, after such examination shall have been had, and affidavit been made, reduce the assessment to the sum specified in the affidavit.

The commissioners could review only on the application of a person conceiving himself aggrieved, and such applicant or objector was one who might have filed his own affidavit to reduce the amount of the assessment. The person referred to could, therefore, only be the one who might apply to reduce the valuation of his own estate, on affidavit or other proof, that

the valuation was too high—not on an affidavit that another's property was valued too low.    Although an undervaluation of one might affect the total amount to be collected from others, it could not affect the only question then before the assessors— what was the true value of the property of the one or the other? As the remedy for the aggrieved party was to be a reduction, not an increase, of valuation, the aggrieved party could only be the one whose property was too highly valued.

Section 21 shows that this affidavit was to be conclusive on the commissioners as before it was on the assessors, for it says that the commissioners must, *thereupon*, correct the assessment-roll for each ward.    It however adds, that they must add and assess, according to law, any real or personal estate liable to taxation, which may have been *omitted by the assessors;* or, (as the act of 1851 substitutes,) which *may not have been assessed* by the assessors.

This is an additional power not possessed before; but it is not an appellate power to increase the assessors' valuation; it is limited by its terms to cases in which the estate has not been assessed by the assessors; to cases in which, by accident or otherwise, they have not exercised their judgment.    New powers granted to inferior jurisdictions are to be construed strictly.    It would be in direct opposition to this rule, and to the plain meaning of the words, to hold a power to add to an assessment-list any real or personal estate not assessed by the assessors, to include a power to add to it such estate which *had* been assessed by them—thus making negative and affirmative language the same.    The language used in 1850—" estate omitted by the assessors "—only included the case where the description of the estate was omitted.    The amendment of 1851 gave the power, not only in that case, but also where the estate was described, but the valuation was omitted by the assessors.    In either case it was not assessed by the assessors, and thus those words have full effect given to them, without giving the commissioners power to increase a valuation.

As this construction also conforms to what has been hitherto the policy of the law in assessments, it is to be assumed to con-

form best with the intention of the legislature, when there is not a clear intention to the contrary. There is also strong reason for retaining the law as it is, unless the law should be amended in other respects.

While the books are in the hands of the assessors the property-owner may see them, and be content with their judgment, or he may see them in the hands of the tax-commissioners on the first day that they are exhibited by the commissioners, and then be willing to submit to the decision made by the assessors. He would then be led to believe that he had no more to do with the assessment. But if the commissioners have the power which they assumed in this case, they might, after he had left, and without any notice to him—without any proofs, except their own opinion—reverse the judgment of the assessors: this, too, they could do in this summary way even where the owner had sworn to the value of his property—and as to personal estate, as well as to real estate. In the case of personal estate the evil would be glaring; for there it might be that the owner, from the nature of the property held by him, (as taxable stocks,) or the extent of his indebtedness, would be able to convince the commissioners that the original valuation was correct. It is true that the commissioners, from a sense of justice, endeavor to give notice to owners before they *definitely* increase their assessment. But there is no provision in the law to compel them to do so; and, until there is some such provision, it would be extremely unjust so to construe a law, by a bold interpretation, as to give the commissioners power, not merely to judge one without his being heard, but to reverse, without his knowledge, a judgment lawfully made where he was heard.

As the commissioners have no right to increase the valuation made by the assessors, and by the increase make illegal the assessment which they impose; they violate their duty as prescribed by the statute, and should be compelled by mandamus, when the application is made in due time, to restore the rolls, so that they shall conform to the statute. And as the supervisors of this county are to correct any erroneous assessment, they were bound to correct this; and should be required to do

NEW-YORK PRACTICE REPORTS. **237**

Adriance agt. The Supervisors of the City and County of New-York.

so by *mandamus*. This has the advantage of being a specific remedy, directly meeting the evil that exists—making valid the assessment which would otherwise be illegal, and saving the supervisors, personally, and probably the city, from heavy losses, if the party aggrieved were left to an action for damages.

This applies to the property on John-street. The next question relates to the property on Third and Fourth avenues, and other property out of town. The right to a reduction there depends on the question, whether Mr. Adriance has fully complied with the law so as to make his interested and biased opinion countervail that of the assessors: to do this he must strictly comply with the law. The act of 1850 gave the right to the owner to reduce the valuation of his own property below that imposed by the assessors, when he relied on his own evidence alone, only after "an examination had been had," "under oath, concerning his property," and an "affidavit been made," by him, "of the value thereof, according to law."

This examination, if it had not been made by the assessors, was to "be had before the tax-commissioners," and the oath to be taken before them. And to show conclusively that the affidavit alone was not sufficient, and that it was not sufficient to reduce that alone to writing, the act requires that "the tax-commissioners shall *reduce such examination to writing*, and the *same* must thereon, *together with the affidavit*, be filed in their office." The affidavit, without the examination, or without the examination being reduced to writing, is of no avail against the sworn valuation of disinterested assessors. (§§ 19, 20, *of the act of 1850, ch.* 121.)

This construction is also reasonable. If the owner is sworn to answer such questions as should be put to him, and should be obliged to say, on oath, that he had been offered two or three times as much for his property as he proposed to value it; that he would not sell it for two or three times as much; that his neighbors' lands on each side of him were no better than his; and that he would give more for their lands than his valuation of his own; and that they had been recently bought

and sold for much more : or if he answered thus to any part of his examination, he probably would refrain from sustaining his first valuation of his own property by a positive affidavit. The legislature meant thus to shield the public from the thoughtless and inconsiderate estimate of an owner.

Whether the act of 1851, (*ch.* 176,) being in *pari materia*, and of a general nature, does not by implication now prevent the affidavit and examination from being conclusive on the commissioners, where they sustain the valuation of the assessors, it is not necessary to inquire. If it is desirable that the commissioners should have the power given by that act to the assessors, it would be most expedient to seek the power from the legislature.

The mandamus is denied as to all the property, except that in John-street; and is granted as to that.